Filed 1/9/23  P. v. Jackson CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B316630 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. A377082) |
| v. | |
| MICHAEL EARL JACKSON, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mark Hanasoso, Judge.  Affirmed.

Joanna Rehm, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Michael C. Keller and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

Forty years ago, when Michael Earl Jackson was 22 years old, a court convicted him on one count of first degree murder and two counts of robbery and found true a firearm allegation. The court sentenced him to a prison term of 25 years to life. We affirmed Jackson's convictions. (*People v. Jackson* (Oct. 15, 1984, B001322) [nonpub. opn.].)

In 2018 the Legislature enacted Penal Code section 1170.95[1] (now section 1172.6), which, as amended effective January 1, 2022, authorizes certain individuals convicted of murder under the felony-murder rule or murder, attempted murder, or voluntary manslaughter under the natural and probable consequences doctrine to petition for resentencing. Jackson filed a petition for resentencing under section 1172.6, alleging facts that made him eligible for relief. After finding Jackson had made a prima facie showing he was entitled to relief, the superior court issued an order to show cause, held an evidentiary hearing, and denied the petition. Jackson argues substantial evidence did not support the court's finding beyond a reasonable doubt he acted with reckless indifference to human life, within the meaning of section 190.2, subdivision (d). We affirm.

---

[1] Statutory references are to the Penal Code.

# FACTUAL AND PROCEDURAL BACKGROUND

A.    *A Court Convicts Jackson on One Count of Murder and Two Counts of Robbery*

One afternoon in February 1982, while driving a stolen car with companions nicknamed "Cal," "Binky," and "Rossi," Jackson began to follow the car in front of him. Binky suggested they steal the car's hubcaps, and Cal said he wanted to take the hydraulics. Jackson followed the car for approximately 25 blocks, waiting for the car to stop, but when Jackson saw his car was running low on gasoline, he came up with the idea to "bump" the car to get the driver to stop. Jackson executed his plan by rear-ending the car, and the car stopped. The driver, Javier Razo, got out of the car, and Cal, Binky, and Rossi got out of Jackson's car. Cal walked to the rear of Razo's car, and Binky and Rossi walked up to the passenger side. Cal had a .22 caliber revolver, Binky had a .32 or .38 caliber gun (of some unspecified kind), and Rossi had a .22 or a .32 caliber revolver. Cal fired a shot in the air and said to Razo, "I am taking your car." Razo moved closer to Cal and reached for Cal's gun. Cal shot Razo in the chest, and Razo fell into the street.

Razo's wife, Angelita Razo, got out of the car. Binky pushed her away and got into Razo's car through the passenger side. Cal and Rossi jumped back into Jackson's car. Binky drove Razo's car away from the scene of the shooting, and Jackson followed.

The four men reconvened at an abandoned church next to the house of Jackson's girlfriend. Binky and Cal began to discuss how much money they hoped to make selling the parts of Razo's car. Jackson said, "Man, come on, leave that car alone. If you're

3

going to do anything to that car, you best get it away from here." When Binky began to look through Angelita's credit cards, Jackson told him to put all of Angelita's items in a plastic bag and get rid of them because, Jackson explained, "you don't leave evidence behind, just in case the police might come." Jackson decided his companions should take Razo's car "across town" if they wanted to strip it. Jackson and Cal went to a nearby liquor store. When they returned, Binky gave Jackson $15 he found in Angelita's purse.

Jackson later learned Razo had died. Jackson asked his friends to bring his bags to the airport, and Jackson took a flight to Chicago.

Eight months later, Jackson returned to Los Angeles because he was trying to "do good." Arturo Zorrilla, the detective who investigated the crimes in this case, arrested Jackson and interviewed him at the police station. After Zorrilla advised him of his constitutional rights under *Miranda v. Arizona* (1966) 384 U.S. 436, Jackson signed and dated a *Miranda* advisement form. Detective Zorrilla then questioned Jackson about the events in February 1982, wrote down Jackson's responses, and read the responses back to Jackson. Jackson signed "each and every page after [his] statement was read back to him."

The People charged Jackson with one count of first degree murder and two counts of robbery. The People also alleged that Jackson committed the murder while he was engaged in the commission of robbery, within the meaning of section 190.2, subdivision (a)(17), and that a principal was armed with a firearm in the commission of the robberies, within the meaning of section 12022, subdivision (a).

4

At the nonjury trial the trial court reviewed Jackson's written statement and the preliminary hearing transcript. The preliminary hearing transcript included the testimony of Detective Zorrilla, who described the procedure he followed to record Jackson's statement and related what Jackson told him in the interview. The preliminary hearing transcript also included the testimony of Angelita, who testified that, when Razo stopped at a red light, "another car came and crashed into ours from the back." Angelita stated Razo put the car in park, got out, and walked to the rear of his car, toward Jackson's car. Angelita testified one of the passengers in Jackson's car got out and began to speak with Razo. Angelita said she "saw that it was taking [a] long [time]" and decided to get out of the car with her baby. She heard Jackson's passenger, who had a gun, say a "bad word" to Razo. Angelita stated she saw a second passenger get out of Jackson's car with a "pistol" in his hand, point it at Razo, and shoot him. Angelita recalled that the shooter, after shooting Razo, fired a shot into the air. Angelita said that she saw Jackson's passengers drive off in Razo's car and that Jackson "was laughing" as he followed them in his car.

The court found Jackson guilty of first degree murder but found not true the special circumstance allegation under section 190.2, subdivision (a)(17).[2] The court also found Jackson guilty on two counts of robbery and found true the firearm allegation

---

[2] At the time of Jackson's trial, the felony-murder special circumstance "required an intent to kill." (*People v. Banks* (2015) 61 Cal.4th 788, 798; see *Carlos v. Superior Court* (1983) 35 Cal.3d 131, 135, overruled on another ground in *People v. Anderson* (1987) 43 Cal.3d 1104.)

5

under section 12022, subdivision (a). The court sentenced Jackson to prison for a term of 25 years to life for the murder of Razo and a concurrent term of five years for the robbery of Angelita. The court also imposed and stayed execution of a five-year term for the robbery of Razo, plus one year for the firearm enhancement.

B. *Jackson Files a Petition Under Section 1172.6, and the Superior Court Denies It*

In January 2019 Jackson filed a petition for resentencing under section 1172.6. Using a preprinted form, Jackson alleged that he was convicted of first or second degree murder under the felony-murder rule or the natural and probable consequences doctrine and that he "could not now be convicted of 1st or 2nd degree murder because of changes made to Penal Code §§ 188 and 189, effective January 1, 2019." Jackson alleged that he "was not a major participant in the felony" and that he "did not act with reckless indifference to human life during the course of the crime or felony."

The People filed an informal response, arguing Jackson devised the plan to "crack" Razo's car, knew there were firearms in the car, was present at the scene of the shooting, "made good the escape of the actual killer," accompanied the other participants to a location where they stripped (or made plans to strip) the car, and did nothing to prevent the shooting or assist Razo or his family. The superior court issued an order to show cause.

At the evidentiary hearing, the court admitted the transcript of the preliminary hearing, the transcript of the sentencing hearing, minute orders from the court's file, Jackson's

1982 statement as recorded by Detective Zorrilla, the probation officer's report, and the opinion from Jackson's direct appeal.[3] The prosecutor argued, among other theories, Jackson could still be convicted of felony murder as a major participant who acted with reckless indifference to human life under *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).[4] Counsel for Jackson questioned the reliability of Jackson's statement to Detective Zorrilla and argued the prosecutor failed to prove beyond a reasonable doubt Jackson was ineligible for resentencing.

The superior court denied Jackson's petition. The court considered each of the factors in *Banks*, *supra*, 61 Cal.4th 788 and *Clark*, *supra*, 63 Cal.4th 522 and found beyond a reasonable

---

[3] Jackson does not argue the superior court erred in admitting any of these documents.

[4] In *Banks*, *supra*, 61 Cal.4th 788 the Supreme Court held the special circumstance allegation under section 190.2, subdivision (d), which provides for increased punishment for certain aiders and abettors of first degree felony murder, requires that the "defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Banks*, at p. 801.) The Supreme Court also held the defendant's "personal involvement must be substantial" and listed several factors courts should consider in determining whether a defendant was a "major participant" in the commission of a crime. (*Id*. at p. 802.) In *Clark*, *supra*, 63 Cal.4th 522 the Supreme Court listed factors to "aid [the] analysis" of whether the defendant "exhibited 'reckless indifference to human life' within the meaning of section 190.2, subdivision (d)." (*Id*., at p. 618.)

doubt Jackson could still be convicted of first degree murder because he "was a major participant in the robbery underlying the felony murder of Razo and acted with reckless indifference to human life." Jackson timely appealed.

## DISCUSSION

A. *Section 1172.6*

Effective 2019, the Legislature substantially modified the law governing accomplice liability for murder, eliminating the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder (*People v. Gentile* (2020) 10 Cal.5th 830, 842-843) and significantly narrowing the felony-murder exception to the malice requirement for murder (§§ 188, subd. (a)(3), 189, subd. (e); see *People v. Strong* (2022) 13 Cal.5th 698, 707-708; *People v. Lewis* (2021) 11 Cal.5th 952, 957).[5] Section 188, subdivision (a)(3), now prohibits imputing malice based solely on an individual's participation in a crime and requires proof of malice to convict a principal of murder, except under the revised felony-murder rule in section 189, subdivision (e). The latter provision requires the People to prove specific facts relating to the defendant's individual culpability: The defendant was the actual killer (§ 189, subd. (e)(1)); the defendant, though not the

---

[5] The Legislature subsequently amended former section 1170.95, subdivision (a), to allow persons convicted of attempted murder under the natural and probable consequences doctrine to petition for resentencing. (See *People v. Coley* (2022) 77 Cal.App.5th 539, 544.) The Legislature later renumbered section 1170.95 to section 1172.6 without changing the text of the statute. (See *People v. Strong, supra*, 13 Cal.5th at p. 708, fn. 2.)

actual killer, with the intent to kill assisted in the commission of the murder (§ 189, subd. (e)(2)); or the defendant was a major participant in a felony listed in section 189, subdivision (a), and acted with reckless indifference to human life, "as described in subdivision (d) of Section 190.2," the felony-murder special-circumstance provision. (§ 189, subd. (e)(3); see *Strong*, at p. 708; *Gentile*, at pp. 842-843.)

Section 1172.6 authorizes an individual convicted of felony murder or murder based on the natural and probable consequences doctrine to petition the superior court to vacate the conviction and be resentenced on any remaining counts if he or she could not now be convicted of murder because of the changes the Legislature made in 2018 to the definitions of the crime. (See *People v. Strong, supra,* 13 Cal.5th at p. 708; *People v. Lewis, supra,* 11 Cal.5th at p. 957; *People v. Gentile, supra,* 10 Cal.5th at p. 843.) As the Supreme Court clarified in *Lewis*, and as amendments to the statute made explicit, if a section 1172.6 petition contains all the required information, the court must appoint counsel to represent the petitioner if requested. (*Lewis*, at pp. 962-963; see § 1172.6, subds. (b)(1)(A), (3).) The prosecutor must then file a response to the petition, the petitioner may file a reply, and the court must hold a hearing to determine whether the petitioner has made a prima facie showing he or she is entitled to relief. (§ 1172.6, subd. (c).)

Where, as here, the petitioner has made the requisite prima facie showing he or she is entitled to relief under section 1172.6, the court must issue an order to show cause and hold an evidentiary hearing to determine whether to vacate the murder conviction and resentence the petitioner on any remaining counts. (§ 1172.6, subd. (d)(1).) At that hearing the court may

9

consider evidence "previously admitted at any prior hearing or trial that is admissible under current law," including witness testimony. (§ 1172.6, subd. (d)(3).) The petitioner and the prosecutor may also offer new or additional evidence. (*Ibid*.; see *Gentile, supra*, 10 Cal.5th at pp. 853-854.)

On appeal from an order denying a petition under section 1172.6, we review the trial court's factual findings for substantial evidence. (*People v. Richardson* (2022) 79 Cal.App.5th 1085, 1090; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 985.) We ""examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." [Citation.] Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*People v. Clements* (2022) 75 Cal.App.5th 276, 298; see *Richardson*, at p. 1090.) "'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.'" (*People v. Brooks* (2017) 3 Cal.5th 1, 57; see *People v. Nieber* (2022) 82 Cal.App.5th 458, 476.)

B. *Determining Whether a Defendant Was a Major Participant and Acted with Reckless Indifference to Human Life*

As discussed, section 189, subdivision (e)(3), provides that a participant in one of the felonies listed in section 189, subdivision (a), may be liable for murder if the prosecution proves he or she "was a major participant in the underlying felony and acted with reckless indifference to human life," within the meaning of section 190.2, subdivision (d). (See *People v. Strong*, *supra*, 13 Cal.5th at p. 708; *Gentile*, *supra*, 10 Cal.5th at pp. 842-843.) The Supreme Court in *Banks*, *supra*, 61 Cal.4th 788 and *Clark*, *supra*, 63 Cal.4th 522 "clarified the meaning of the special circumstances statute." (*In re Scoggins* (2020) 9 Cal.5th 667, 676 (*Scoggins*); see *People v. Ramirez*, *supra*, 71 Cal.App.5th at p. 986.)

Considerations that "may play a role in determining whether a defendant's culpability is sufficient" for a finding he or she was a major participant under section 190.2, subdivision (d), include: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Banks, supra*, 61 Cal.4th at p. 803, fn. omitted; see *People v. Mitchell* (2022) 81 Cal.App.5th 575, 591

11

(*Mitchell*); *People v. Ramirez, supra,* 71 Cal.App.5th at p. 986, fn. 10.)

"Reckless indifference to human life has a subjective and an objective element. [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, "'[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation."'" (*Scoggins, supra,* 9 Cal.5th at p. 677.)

To determine whether a defendant exhibited reckless indifference to human life under section 190.2, subdivision (d), courts consider, among other factors, the following: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*Scoggins, supra,* 9 Cal.5th at p. 677; see *Clark, supra,* 63 Cal.4th at pp. 618-623.)

The requirements for finding major participation and reckless indifference to human life "'significantly overlap . . . in

12

general, for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.'" (*Clark*, *supra*, 63 Cal.4th at p. 615; see *People v. Owens* (2022) 78 Cal.App.5th 1015, 1023.) "No one of these considerations is necessary, nor is anyone one of them necessarily sufficient." (*Banks*, *supra*, 61 Cal.4th at p. 803; see *Clark*, at p. 618.) "We analyze the totality of circumstances" (*Scoggins*, *supra*, 9 Cal.5th at p. 677; see *Mitchell*, *supra*, 81 Cal.App.5th at p. 592) to determine whether Jackson acted with reckless indifference to human life.

C.     *Substantial Evidence Supported the Superior Court's Finding Jackson Acted with Reckless Indifference to Human Life*

Jackson does not challenge the superior court's finding he was a major participant, within the meaning of section 190.2, subdivision (d).[6]  The only issue is whether substantial evidence supported the court's finding Jackson acted with reckless indifference to human life.  And substantial evidence supported that finding.

Virtually all of the factors under *Clark*, *supra*, 63 Cal.4th at pages 618 to 623 supported the court's finding Jackson acted with

_____

[6]     In his reply brief, Jackson suggests his actions "were no more than acts of an ordinary aider and abettor to an armed robbery." (See *Banks*, *supra*, 61 Cal.4th at p. 802 ["a defendant's personal involvement must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder"].)  To the extent Jackson may be arguing for the first time on reply he was not a major participant, he has forfeited the argument. (See *People v. Rangel* (2016) 62 Cal.4th 1192, 1218-1219.)

13

reckless indifference to human life; none supported a contrary finding. First, as Jackson's 1982 statement demonstrated, even before Jackson crashed into Razo's car, he knew his accomplices were armed. He identified for Detective Zorrilla the type of guns Cal, Binky, and Rossi were carrying, from which the superior court could reasonably infer Jackson knew they were armed when they got out of his car. By the time Cal fired a warning shot, Jackson undoubtedly knew not only that Cal had a gun, but also that he was willing to use it. Jackson, sitting in the driver's seat, had a clear view of Cal and Razo, who stood on the driver's side of Razo's car, directly in front of him. (See *In re McDowell* (2020) 55 Cal.App.5th 999, 1013 (*McDowell*) [the first factor for determining reckless indifference to human life "cut[ ] against" the defendant because the evidence showed he knew, "no later than the warning shot," his accomplice "was both carrying and willing to fire a gun"].) That his companions ultimately used more than one firearm to rob Razo and Angelita further supported the superior court's finding. (See *People v. Bradley* (2021) 65 Cal.App.5th 1022, 1033 ["defendants were aware they all had firearms and used them during the attempted robbery"]; cf. *Clark*, *supra*, 63 Cal.4th at p. 619 [evidence "showed only that there was one gun at the scene"].)

Second, Jackson was physically present at the scene of the crime. He had an opportunity to prevent the shooting, and later an opportunity to come to the aid of Razo; he did neither. Jackson did not yell out the window or get out of his car to encourage his confederates to retreat from the escalating confrontation. Jackson did not intervene after he heard Cal's warning shot or Cal's statement to Razo that he was going to take his car. And Jackson remained at his post, behind the

14

steering wheel, when Angelita got out of Razo's car with her baby. According to Angelita, Razo put his car in park after the collision, so that Jackson was no more than a few feet from Cal and Razo and in a prime position to intercede. Jackson, however, did nothing. (See *Mitchell*, *supra*, 81 Cal.App.5th at pp. 592-593 [defendant "could have rejected the planned crime or could have adjusted the method to take victim welfare into account," and his failure to do either supported the finding he acted with reckless indifference to human life]; *McDowell*, *supra*, 55 Cal.App.5th at p. 1014 [after the defendant's accomplice fired a warning shot, "there was a brief but critical opportunity" for the defendant "to say or do something to deescalate the situation," but "he remained silent"]; *In re Loza* (2017) 10 Cal.App.5th 38, 53 [defendant's companion "made clear his intent to shoot" by counting down from five, which afforded the defendant "the time to observe and react before the murder"]; see also *Clark*, *supra*, 63 Cal.4th at p. 619 ["where the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force," the "'defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state'"].)

Third, Jackson was callously indifferent to the fact a man had been shot, in the chest, in front of his wife and child. Jackson did not call 911, try to get or render aid, or drive Razo to a hospital. Instead, Jackson laughed as he drove off with his confederates, leaving Razo to die in the street, and reconvened with his companions to collect his share of the robberies' proceeds. And by stealing Razo's car, Jackson increased the risk Razo would die from his wounds by depriving Angelita of the means to take Razo to a hospital. (See *In re Loza, supra*,

15

10 Cal.App.5th at p. 54 [defendant's failure to aid the victim after the shooting and his subsequent flight supported the finding he acted with reckless indifference to human life].)

Fourth, Jackson knew his confederates were likely to commit a violent crime and use lethal force. "A defendant's knowledge of factors bearing on a cohort's likelihood of killing" may be "evident before the felony or may occur during the felony." (*Clark*, *supra*, 63 Cal.4th at p. 621.) As discussed, Jackson saw Cal brandish his weapon before shooting Razo. (See *People v. Owens*, *supra*, 78 Cal.App.5th at p. 1024 ["even if appellant did not know of [his confederate's] proclivity for violence *before* the robbery, it is reasonable the trial court could have inferred that knowledge became evident to appellant *during* the robbery"].) Jackson also knew the specific calibers and kinds of firearms Cal, Binky, and Rossi carried that day, from which the superior court could reasonably infer that carrying firearms was the norm for all four men. During the robberies, Jackson remained in his car, ready to flee with his companions, and watched as the violence unfolded. And after the shooting, Jackson reacted, not with surprise, outrage, panic, or remorse, but with laughter.

Fifth, Jackson made no effort to minimize the risks of violence during the robbery. Jackson did not suggest his companions leave their firearms in the car, nor did he get out of the car to try to defuse the situation. To the contrary, Jackson provoked the confrontation with Razo by deliberately crashing his car into Razo's car. (Cf. *Scoggins*, *supra*, 9 Cal.5th at p. 679 [defendant "had planned for the beating and robbery to be unarmed"]; *Clark*, *supra*, 63 Cal.4th at pp. 621-622 ["there were not supposed to be any bullets in the gun"].) In addition, even

16

after Angelita got out of the car with her baby, Jackson stayed in his seat, positioned to make a quick getaway with his friends. Jackson's failure to restrain Cal at that point confirms he was not concerned about the increased danger and risk of death to Razo and his family. (See *In re Harper* (2022) 76 Cal.App.5th 450, 466 [although the defendant "may not have had the opportunity to minimize the risk of violence during the planning stage, he did nothing to minimize the risk of violence when it became clear the original plan had unraveled"].)[7] In sum, substantial evidence supported the superior court's findings that, under the totality of the circumstances, Jackson consciously disregarded "'the significant risk of death'" his actions created and that his conduct grossly deviated from the standard of conduct of a law-abiding person. (See *Scoggins*, *supra*, 9 Cal.5th at p. 677.)

Jackson asserts there was no evidence "he had the ability to intervene in time to stop a shooting." But there was. Unlike the defendants in other cases who could not have intervened because they were not present at the scene of the shooting, Jackson was at the scene, no more than a car's length away from Cal and Razo. (Cf. *Scoggins*, *supra*, 9 Cal.5th at p. 678

---

[7] The sixth factor, the duration of the robbery, does not necessarily support or undercut the superior court's finding Jackson acted with reckless indifference to human life. (See *Clark*, *supra*, 63 Cal.4th at p. 620 ["Where a victim is held at gunpoint . . . in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder."].) It is not clear from the record how much time elapsed between the traffic collision and Cal's fatal shot. The evidence indicates the initial encounter between Cal and Razo lasted, in Angelita's words, "a long time," but it is not clear when Cal and Binky drew their weapons.

[defendant, who remained at a nearby gas station during the course of the crime, "was not in a position to restrain" the shooter]; *Banks*, *supra*, 61 Cal.4th at p. 807 [defendant "did not see the shooting happen, did not have reason to know it was going to happen, and could not do anything to stop the shooting or render assistance"]; *In re Taylor* (2019) 34 Cal.App.5th 543, 559 [defendant "could not even see" the shooter's interaction with the victim]; *In re Bennett* (2018) 26 Cal.App.5th 1002, 1025-1026 [defendant "was across the street" and "did not see or know if anyone was shot or hurt"].) Jackson had the opportunity and ability to intervene; he just chose not to.

*In re Moore* (2021) 68 Cal.App.5th 434, cited by Jackson, is distinguishable. In that case the defendant and his cohorts planned to steal an unoccupied car in a parking lot. (*Id.* at pp. 440-441.) After the group stole the car, one of the defendant's companions accosted three people passing through the parking lot, robbed them at gunpoint, and killed one of them. (*Ibid.*) There was no evidence the defendant planned to commit these additional crimes, and the record suggested there was at least some distance between the defendant, who sat in the driver's seat, and the deadly encounter, which occurred outside on the passenger's side of the car. (*Ibid.*) Here, the evidence showed the confrontation between Cal and Razo occurred directly in front of Jackson, on the driver's side of Razo's car.

Referring to two cases decided by the United States Supreme Court, Jackson asserts he "lies closer to the *Enmund* end of the spectrum, and not the *Tison* end." In *Enmund v. Florida* (1982) 458 U.S. 782 [102 S.Ct. 3368] the only evidence implicating the defendant in two murders during the course of a robbery was "the inference" he "was the person in the car by the

side of the road at the time of the killings, waiting to help the robbers escape." (*Id*. at p. 788.) The United States Supreme Court held the Eighth Amendment did not allow a court to impose the death penalty on a defendant "who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." (*Id*. at p. 797.) In *Tison v. Arizona* (1987) 481 U.S. 137 [107 S.Ct. 1676] the United States Supreme Court described two "subsets" of felony murders, one (as in *Enmund*) where the defendant is a "minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state," and the other where the defendant is "the felony murderer who actually killed, attempted to kill, or intended to kill." (*Id*. at pp. 149-150.) For the defendants in between those two "poles," the Supreme Court stated that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." (*Id*. at p. 158.) The Supreme Court in *Tison* concluded each of the defendants in that case "was actively involved in every element of the kidnapping-robbery and was physically present during the entire sequence of criminal activity culminating in the murder of the [victims] and the subsequent flight." (*Id*. at p. 158.)

Jackson's substantial involvement in the robberies, his proximity to the shooting, and his opportunity to reduce the risk of a fatal shooting made him more like the defendants in *Tison* than the defendant in *Enmund*. As discussed, Jackson provided direction during key moments of the armed robbery: He masterminded the plan to cause a traffic collision to force Razo to stop, which left Razo and his family vulnerable to Jackson's armed confederates; he sat in the driver's seat, ready to facilitate

19

his confederates' flight, and watched the encounter escalate from a robbery to a killing without making any effort to intervene; instead of making an attempt to render aid to Razo, he drove away laughing and took his companions to a safe location to discuss splitting up the proceeds of the robberies; and he instructed his companions on how to properly dispose of the stolen goods and destroy incriminating evidence. Jackson, "[f]ar from merely sitting in a car away from the actual scene of the murders" (*Tison*, *supra*, 481 U.S. at p. 158), participated in every step of the crime and engaged in conduct "'known to carry a grave risk of death'" (*Scoggins*, *supra*, 9 Cal.5th at p. 676).

Finally, Jackson argues the superior court erroneously "dismissed [his] youth as bearing on his culpability." As the court correctly found, however, Jackson did not introduce any evidence he lacked the maturity to comprehend the risks of the crimes he committed. (Cf. *People v. Ramirez, supra*, 71 Cal.App.5th at p. 991 [that the defendant "was influenced by peer pressure" and "was afraid" of the consequences if he did not aid the shooter "may well have affected his calculation of the risk of death posed by using the firearm in the carjacking"].) In fact, the record reflects Jackson demonstrated sophistication and leadership by formulating the plan to force Razo to stop and instructing his companions on how to reduce suspicion by law enforcement. And unlike the defendants in the cases on which he relies (*Ramirez*, at p. 975 [15-year-old defendant]; *In re Moore*, *supra*, 68 Cal.App.5th at p. 453 [16-year-old defendant]; *People v. Harris* (2021) 60 Cal.App.5th 939, 944 [17-year-old defendant]), Jackson was not a teenager; he was 22 years old. Jackson's decision to flee the scene (and later the state) after the crime and his subsequent interview with Detective Zorrilla showed he was sufficiently

mature and aware that he appreciated the risks to human life his criminal conduct created.  (See *Mitchell*, *supra*, 81 Cal.App.5th at p. 595 ["every 18 year old understands bullet wounds require attention"].)  As the superior court stated, "Age alone is insufficient to negate a mental state."  (See *In re Harper*, *supra*, 76 Cal.App.5th at p. 472 ["it is one thing to say petitioner should eventually be eligible for a parole hearing because he was a minor at the time of the offense, and quite another to say he did not have the maturity to have acted with reckless disregard for human life"].)

## DISPOSITION

The order denying Jackson's petition under section 1172.6 is affirmed.

SEGAL, J.

We concur:

PERLUSS, P. J.

FEUER, J.

21